*1565·14*

ORIGINAL

IN THE COURT OF
CRIMINAL APPEALS
AUSTIN, TEXAS

FILED IN
COURT OF CRIMINAL APPEALS

FEB 03 2015

Abel Acosta, Clerk

CLINT WELDON WILSON,
       Appellant Pro Se
Vs.

THE STATE OF TEXAS,
       Appellee

Appeal From
THE SIXTH COURT OF APPEALS, TEXARKANA, TEXAS
NO. 06-14-00021-CR

PETITION FOR DISCRETIONARY REVIEW

CLINT WELDON WILSON
T.D.C.# 1891353
CLEMENTS UNIT
9601 Spur 591
AMARILLO, Texas 79107

RECEIVED IN
COURT OF CRIMINAL APPEALS

FEB 03 2015

Abel Acosta, Clerk

## IDENTITY OF PARTIES

Pursuant to Texas Rule of Appellate Procedure the following is a list of the Parties:

Appellant
Clint Weldon Wilson,
Pro Se

Clint Weldon Wilson
T.D.C.# 1891353
Clements Unit
9601 Spur 591
Amarillo, Texas 79107

Appellee
THE STATE OF TEXAS

Will Ramsey
Hopkins County Dist. Attorney
114 Main Street
Sulphur Springs, Tx. 75482
903-885-0641

i.

# Table of Contents

Identity of Parties...........................................i.

Table of Contents......................................... ii.

Index of Authorities..................................... iii.

Statement of Case...................................... pg. 1

Statement of Facts..................................... pg. 2

Preview of Argument................................... pg. 20

Argument............................................ pg. 20,22

Conclusion.......................................... pg. 22

Prayer.............................................. pg. 22

Certification....................................... pg. 23

# Index of Authorities

**Texas Criminal Appeals case laws:**

Williamson Vs. State, 672 Sw. 2nd,484-86 (Tex.Crim.App.1984)
pg. 20,22

Smith Vs. State, 965 Sw 2nd,509-13 (Tex.Crim.App.1998)
pg. 20

Matthews Vs. State, 708 Sw. 2nd,835-38 (Tex.Crim.App. 1986)
pg. 20

IN THE COURT OF

CRIMINAL APPEALS

AUSTIN, TEXAS

CLINT WELDON WILSON,
          Appellant Pro Se

Vs.

THE STATE OF TEXAS,
          Appellee

Appeals From

THE SIXTH COURT OF APPEALS, TEXARKANA, TEXAS

NO. 06-14-00021-CR

PETITION FOR DISCRETIONARY REVIEW

CLINT WELDON WILSON
T.D.C.# 1891353
CLEMENTS UNIT
9601 Spur 591
AMARILLO, TEXAS 79107

## Statemnet of Case

This is an appeal of The Sixth Court of Appeals judgement that has Rendered on November 7, 2014 from a conviction and life sentence for murder that arose out of the 8th District Court of Franklin County, Texas, trial court No. F8775. A jury has empaneled on November 19, 2013 and on November 2, 2013, that jury rendered a Verdict of Guilty.

1.

Appellant filed a Motion for Extension of Time to file this said Petitionfor Discretionary Review on November 25, 2014 and wa granted by The Court of Criminal Appeals making this Petition to be due on on February 6, 2015.

## Statement of Facts

On January 19, 2013, Aldis Mendez, herein as Aldis stood in be -tween two men, her then boyfriend, Clint Weldon Wilson, herein as Appellant, and he ex-boyfriend and father to her three childr- en, Juvenal Gonzales, herein as Gonzales, just before Appellant shot and killed Gonzales.

## BACKGROUND ON DECENDENT

The decendents name Mr. Juvenal Gonzales ("Gonzales"). There is no dispute that Gonzales died from multiple gunshot wounds on the morning of Saturday, January 19, 2013, and that it was the de -fendent, Appellant who shot him. As the State noted in its open- ing statement, **"This is not a whodunit".** (Vol. 4;P. 18; 1. 5-6). Appellant agrees.

Also in its opening statement the State told the jury, **"Rememb -er what i said about Juvenal."** (Vol. 4; P. 25; 1. 20). Appellant agrees with this, too. Evidence adduced at trial showed that Gonz -ales had the following three (3) flaws, all of which are importa -nt for understanding of the facts of this case:1

) First, Gonzales drank alot.

) Second, Gonzales fought alot.

) Third, and with regard to a woman who bore him three children, Gonzales argued alot.

Each flaw is discussed below.

## Gonzales drank alot

Evidence adduced by the State showed that Gonzales was a "heavy drinker." (Voo. 4; P. 82; 1. 4) (Vol. 4; P. 40; 1. 9-10) (Vol. 4; p. 149; 1. 11-12) (Vol. 4; P. 215; 1. 1-2). Gonzales drank almost every day (Vol. 4; P. 40; 1. 11-12) and he drank heavily on week- ends. (Vol. 4; P. 40; 1. 13-15). According to his girlfriend at the time, "Juvenal [Gonzales] would wake up and statt drinking. And he would take a nap, eat,wake up again -you know, eat and ta- ke a nap, wake up, you know, and start drinkng again, and go back

2.

to sleep." (Vol. 4; P. 40; 1. 17-20). This same girlfriend also testified that she had seen Gonzales drink an entire 30 pack of beer starting from when Gonzales woke up at aboutsix in the morning to the time when Gonzales satrting sleeping it off at eight in the evening. (Vol.4; p. 82; 1. 12-13). Givcen evedence like this, it should come as no surprise that during its opening state -ment the State discribed called Gonzales a **"functioning alcohol= ic."** (Vol. 4; p. 19;1. 8).

Gonzales girlfriend on January 19, 2013 acknowledged that Gon -zales's drinking "affected his judgement." (Vol. 4; p. 82; 1. 16 -17). Gonzales's girlfriend also acknowledged that if a person is three times the legal limit of alcohol for driving, as was Gonza-les-at-the-time-of-the shooting, its-going- to- affect a persons ju -dgement. (Vol.4; pp. 82-83; 1. 25-2).

The jury also heard from Gonzales's former girlfriend, the one with whom he had three children. This person testified, in subst= ance, that Gonzales was a mean drunk:

> Q. How did he [i.e. Gonzales] act when he was intoxicated?
> A. Well, different ways. Depends on what he was doing.
> Q. Well, if, in your words, he was pissed off, how would he act if he was drunk?
> A. He would probably just start fighting.
> Q. Would you say that he was more than likely to get into a fight if he was drunk than if he was sober?
> A. Yes.
> Q. He would be more aggressive?
> A. Yes.

(Vol. 4; p. 172; 1. 10-21). The mother of former Gonzales's girl-friend gave similar testimony:

> Q. Did he [i.e. Gonzales] get violent when he drank?
> A. I say vilent. He used to hit the walls . He never hit her [i.e. his former girlfriend], but he use to get mad and he would hit the walls.
> Q. But he wouldn't do that if he wasn't drinking?
> A. No.
> Q. He was more upset , or more violent...when was drinking?
> A. Yes.

(Vol. 4; pp. 233-34; 1. 24-8).[2]

## Gonzales fought alot

During its opening, the State told the jury that Gonzales **"was not afraid to fight."** (Vol. 4; p.19; 1. 15-16). Defendent- Appell-

ant agrees with the States assessment.

Citing one example, Gonzales former girlfriend wrote the following after the shooting and put it on Facebook®:

"[E]veryone that really knew Juvenal Gonzales would only-would know that he is gone today, he is resting. Juvenal Gonzaleswas never scared of shit. He always had heart. He didn't step away the day when he had warning shots first because all it did was piss him off. That's what happened. Juvenal Gonzales straight up gangster, Latin Kings, Bloods. Will always love you with all of my heart."
(VOl.4; p. 152; 1. 18-25).3 The mother of Gonzales former girlfriend also testified that she had seen Gonzales fight. (Vol.4; p. 215; 1. 19). This happened at a party hosted by his sister. (Vol. 4; p. 222; 1. 6-9). The mother of Gonzales former girlfriend also testified that she had seen Gonzales get into a heated argument with a 17 year old family member named Luis. (Vol. 4; p.221; p. 5-13). Although the argument did not escalate to punches being thrown, or worse, it was sufficiently severe for the police to show up and put Gonzales in hand cuffs. (Vol.4; p. 222; 1. 2-5).

Gonzales proclivity for fighting was so acute-and alarming-it prompted the mother Gonzales's former girlfriend to obtain what she believed to be some sort of order from the police instructing Gonzales to stay away from her daughters home. (Vol.4; p.220; p. 22-24).

## Gonzales argued alot with the mother of his children

Gonzales was the father of at least three children. The mother of these three children is Ms. Aldis Mendez. (Vol. 4; p.117; 1. 1-19). Both the mother and the grandmother of these three children share the same last name. For that reason Ms. Aldis Mendez, Gonzales's former girlfriend and the mother of Gonzales's chidren, shall hereinafter be referred to as "Aldis M."

The children's grandmother and Aldis M."s mother is Suyapa Mendez. She shall hereinafter be referred to as "Suyapa M." She gave the following assessments of the relationship between her daughter and Gonzales: "They did have problems. I can honestly say that he [i.e. Gonzales] was jealous." (VOL. 4; p.234; 1. 13-14).

Suyapa m."s assessement is supportedby other evidence adduced at trial, which shows that from Year 2006 through March 2012, Gonzales and Aldis m. had an on again, off again relationship. (Vol. 4; p. 118; 1. 1-16). In in its opening statement, the State expressed it s beliefthat Gonzales's relationship with Aldis M. was **"rocky at best"** (Vo;. 4; p. 24; 1. 17). That Gonzales and Aldis M. often argued (Vol. 4; p.24; 1. 17-18). Defendent-Appellant agrees.

Gonzales's girlfriend at the time of the shooting was Ms. Bridget Sanchez. Sanchez discribed her understanding of the relationship between Gonzales and Aldis M. as follows: "there was [sic] breakups. cheating. There was- they never got along or understood each other, so there was aggression from both parties." (Vol. 4; p. 104-105; 1. 25-3).

At trial, Aldis M. insisted that "I always did love him," referring to Gonzales. (Vol. 4; p. 139; 1.11). Aldis M. pointed to the fact that Gonzales was the father of my kids. (Vol.4; p. 139; 1. 12). Apparently the State was not impressed. During its closing arguments, it called Aldis M. a **"crook"** and a **"liar."** (Vol. 7; p. 52; 1. 8).

## BACKGROUND ON DEFENDANT-APPELLANT

Defendant-Appellant's name is Clint Weldon Wilson. There are two important things one needs to know to understand the facts of this case. They are:

) First, Wilson suffered from frostbite in both hands and one foot.

) Second, Wilson was in an intimate, live-in relationship with Aldis M. at the time of the shooting.

Each of the foregoing is discussed below.

## WILSON SUFFERED FROM FROSTBITE IN BOTH HANDS AND ONE FOOT

In late December 2012, Wilson suffered from severe frost bite in his hands and feet (Vol. 4; p. 141; 1. 22-25), for which he was treated at East Medical Center ("ETMC") in Clarksville. (Vol. 6; p. 72; 1. 9)(admitting Def.Ex. 1, which are medical records). Wilson's frostbite was so severe that ETMC Clarksville Careflited Wilson to ETMC in Tyler. (VOl.6; p.88; 13-17).

Recovery from frostbite takes six to eight weeks. (Vol. 6; p. 90;1. 11-15). Thus it is most likely that Wilson was still suffering from the effects of the frostbiteon January 19, 2013, the date of the shooting. (Vol. 6; p. 90; 1. 6-10).

Wilson was in an intimate, live-in relationship with Aldis M. at the time of the shooting

The person who picked up Wilson from ETMC Tyler was Aldis M. (vol. 4; p. 142; 1. 11-13)(Vol.4; p. 181; 1. 9-16)(Vol.4; p. 181; 1. 21)(Vol. 6; p. 112; 1.24-25). One Aldis M.'s three children, a three year old named Lexis, even called Wilson "daddy".(Vol. 4; p . 182-83; 1. 25-1). The other two children also called Wilson "daddy" sometimes. (Vol.4; p. 183; 1. 2-3).

Wilson felt pain when somebody touched his frostbitten hands. (Vol. 4; p. 224;1. 4-6). Suyapa M. testifeid that she saw Wilsons hands without any bandages. (Vol.4; p. 225; 1. 2-4). According to her, Wilson's hands were dark, and Wilson was unable to move his fingers. (VOL.4; p. 225; 1. 4-9), although by January 19, 2013 he was able to use his hands to drive a car. (Vol.4; p. 194; 1. 11-13).

According to Aldis M. she and Wilson began "going out" in the beginng of the September 2012. (Vol.4; p. 119; 1. 6-14). Aldis M. testified that although she and Wilson did not live together, Wilson did spend"every other day", with Aldis M. at her trailor home in Franklin County, Texas. (Vol. 4; p. 119; 1. 19-23)(Vol. 4; p. 180; 1. 25).

SuyapaM. who lived next door to Aldis M., was more candid about her daughters living arrangements. Suyapa M. testified that what Aldis M. may have said, Wilson was living with her daughter at her daughters trailor home, and Wilson had been living their for about two months. (Vol.4; p. 223; 1. 4-8).

Wilson also testified that he lived with Aldis M. at Aldis M. trailer home beginng inearly September 2012. (Vol. 4; p. 223; 1. 176-23). After a brief hiatus around Christmas, Wilson testified that he resumed living with Aldis M. after leaving ETMC Tyler for frostbite. (Vol. 6; p. 116; 1. 8-12).

Aldis M.'s relationship with Wilson infuriated Gonzales-never mind the fact that Gonzales and AldisM. had split up around March 2012, and never the fact that Gonzales had been living with another woman, Bridget Sanchez, in September 2012. According to Aldis M., "Juvenal "Gonzales" would call me, and call me." (Vol. 4; p. 140; 1. 14). Accord, (Vol. 4; pp. 150-51; 1. 18-1). Said Aldis M. , Gonzales "would just keep calling and calling, and finally Clint [Wilson] would get on the phone himself, and tell him [i.e. Gonzales] to stop calling." (Vol.4; p. 140; 1.19-21)(Vol.4; p. 151; 1. 2-4). Wilson agrees with his testimony. (Vol. 6; pp. 129-30; 1. 21-4)("just leave us alone").

But Gonzales did not stop calling, and he did not leave Aldis M. or Wilson alone. Instead,Gonzales continued to call Aldis M., prompting Wilson to pick up the phone. (Vol.4; p. 151;1.5-12). Wilson and Gonzales then "would argue" (Vol. 4; p. 140; 1. 14-15) whereupon Gonzales would often threat Wilson(Vol. 6; p. 127-28; 1. 20-1),4 and they would cuss out each other. (Vol. 4; pp. 140-41; 1. 25-1)(Vol. 4; p.151; 1.16).

## EVENTS OF SATURDAY, JANUARY 19,2013

At about six o'clock in the morning (Vol. 4; p. 41; 1. 4-6), Gonzales telphoned Sanchez(Vol.4; pp. 37-38;1. 25-5)(Vol.4; p. 105; 1. 4-6), who had spent friday night at the home of her mother.(Vol. 4; p. 180; 1.5-8). The two were having problems, and they about two hours on the phone. (Vol. 4; p. 41; 1. 6). During this telephone call Gonzales told Sanchez that he was coming over to pick her up, but only after he stops in Winnsboro and buys a 30 pack of beer. (Vol.4; p. 41; 1. 8-9).

Gonzales got into his brothers Blue GMC truck(Vol. 4; p. 121; 1. 15-18)(Vol. 4; p. 201; 1. 23-24)(Vol. 4; p. 70; 1. 17-19)(Vol. 4; p. 212; 1. 13), and drove to Winfield (not Winnsboro), where he bought a 30 pack of beer. (ol.4; p. 41; 1. 11-12 & 20-22). Gozales made his purchase within the store had opened at 8:00 o'clock. (Vol. 4; p. 81; 1. 4-7).

Gonzales then drove to Mount Vernon to the home of Sanchez's mother. (vol.4; p. 41; 1.24-25)(Vol.4; p. 80; 1. 18-20). This happened between 8:30 a.m. and 9:00 a.m.(Vol. 4; p. 80; 1. 23-25). Gonzales and Sanchez stayed at the home of Sanchez's mother for "less than an hour." (Vol 4; p. 81; 1. 14).

Gonzales and Sanchez then left in the same truck and went to

7.

Sulpher Springs to see a friend/former co-worker of Gonzales. (Vol. 4; pp.42-43; 1. 20-11). While there-it was still Saturday morning--Sanchez saw Gonzales"drinking a few beers."(Vol 4; p. 43; 1. 21).

Gonzales and Sanchez then left Sulphur Spings. (Vol. 4; p. 44; 1. 10-11). According to Sanchez told her that he "should just go ahead and pick up the chidren," whereupon he telephoned the mother of his children, AldisM., who did not answer the phone.(Vol. 4; p.44-45; 1. 24-1). Gonzales then left a voicemail message with Aldis M. saying that he was on his way to pick up the children. (Vol. 4; p. 45; 1. 2-3). On the way over Gonzales called AldisM. a second time, this time while he was getting gas in Winnsboro. (Vol. 4; p. 45; 1. 7).

Gonzales with Sanchez riding shotgun, drove Aldis M.'s trailer home in Mount Vernon. (Vol. 4; p. 45; 1. 14-16). Unlike Sanchez, Gonzales knew the way. After all, Gonzales had lived there with Aldis M. and there three childre as recently as March 2012, i.e, nine months earlier. (Vol. 4; pp. 118-19; 1. 12-1). Aldis M.'s trailer home in Mount Vernon, Franklin County, was located next to the home of Aldis M.'s mother, Suyapa M.(Vol.4; p. 116; 1. 609).

Gonzales did not drive straight into Aldis M.'s driveway, instead, Gonzales "kind of made this swirl to see who was parked in the back." (Vol.4; p. 46; 1. 4-5). Gonzales did this said Sanchez "to see... who was parked in the back [of Aldis's trailer home]." (Vol. 4; p. 86; 1. 12-14).

Gonzales then starting honking.(Vol.4; p. 46; 1. 12&16). Sanchez was aware of the rocky relationship between Gonzales and Aldis M., and she ask Gonzales to stop honking. (Vol. 4; p. 46; 1. 12-14). However, Gonzales continued honking. (Vol.4; p. 46; 1. 15).

Sanchez then suggested taht Gonzales get out of the truck and knock on the door of Aldis M.'s trailer home, which Gonzales did. (Vol. 4; p. 47; 1. 10). Sanchez watched Gonzales "walking up to the porch" of the dwelling. (Vol.4 p. 47; 1. 10). Sanchez testified that she saw how Gonzales "was getting ready to open the door" of the dwelling. (Vol.4; p. 47; 1. 10-11). However, Sanchez testified that before Gonzales actually opened the door, a three year child with whom Sanchez was familiar with named Lexis(Vol. 4; p.

8.

51; 1. 4-8) opened the door.(Vol. 4; p. 47; 1. 12-14)(Vol.4; p. 51; 1. 1-11).

Sanchez never saw Gonzales knock. (Vol. 4; pp. 87-88; 1. 23-1). Rather, Sanchez testified thta what she did see was Gonzales "touch the doorknob." (Vol. 4; p. 87; 1. 18). Sanchez conceded that touching a doorknob "is not knocking[.]"(Vol.4; p. 87; 1. 22).

Gonzales's presence came as a surprise. Gonzales had not come to Aldis M.'s home to see the kids at any time while Wilson had been living with Aldis M.(As previously noted, Wilson began living Aldis M. in Setember 2012, and this was January 19, 2013.) While there is evidence that Gonzales did try to call Aldis M., there is no evidence that he and Aldis M. actually talked by telephone that morning.

In any event, Aldis M. testified that when she left the back bedroom she saw that Gonzales "had the door open" and was "stepping in" to Aldis M.'s home.(Vol.4; p. 122; 1. 10). Aldis M. gave the following testimony:

Q. Now, Mr. Gonzales did'nt have permission to be in the house, did he?

A. No.

Q. So when he came into the house, your little girl did'nt let him in, did she?

A. No. He opened the door.

(Vol.4; p. 155; 1. 4-7).

. . . .

Q. At that moment, did you think he was tresspssing in your house?

A. Well, yeah. I did'nt ask - I mean, he did'nt knock or anything.

Q. That's right. He just came in did'nt he?

A. Yes.

(Vol. 4; p. 155-56; 1. 21-1). Indeed, Aldis M. was under the impression that her mother had somehow obtained a restraining order Aldis M. called it a restricting order, That prohibited Gonzales from going to her trailer home. (Vol.4; p. 187; 1. 5-14). Whatever it was called, Suyapa M. had obtained this order because, as Aldis M. put it, Gonzales was always looking for her.(Vol.4; p.

179; 1. 7-10).

However, he got there, neither party disputes that Gonzales was eventually inside the home of Aldis M. According to Sanchez, Gonzales was "[r]ight inside the door" of Aldis M.'s home. (Vol. 4; p. 52; 1. 7) (Accord, Vol. 4; p. 129; 1. 13-16)(Aldis M. describing Gonzales as standing "right infront of the door"). Sanchez testified thta she saw Gonzales take "a big step - like one or two steps" - so she agreed that Gonzales was about two feet Aldis M.'s home.(Vol.4; p. 88; 1. 5-9). Sanchez who was still inside the truck at the time, saw, only Gonzales's back(Vol. 4; p. 52; 1. 7-9) - but other than that, she saw nothing out of the ordinary. (Vol.4; p. 52; 1. 13-15).

On cross examination, Sanchez acknowleged that she was trying to use Gonzales's mobile phone at the time to call and text her brother, and that she was not familiar with Gonzales's mobile phone nad could not unlock it(Vol. 4; p. 51; 1. 23). As a result, Sanchez was more focused on the mobile telephone than what was taking place inside Aldis M.'s home. (Vol.4' p. 93; 1. 7-9).

With Gonzales inside, Aldis M. shut the bedroom and approached him. (Vol. 4; p. 122; 1. 13-14). According to Aldis M. , she asked Gonzales what he was doing here; also according to Aldis M. Gonzales answered that he was there because he "wanted to see the kids." (Vol.4; p. 122; 1. 21-23)(Vol.4; p. 123; 1. 18). Aldis M. responde by telling Gonzales that the children were next door at the home of her mother, Suyapa M.(Vol.4; p. 123; 1.20-23)(Vol. 4; p.199; 1. 7-10). According to Aldis M. Gonzales said that she lying. (Vol. 4; pp. 123-24; 1. 25-2).

But this one time when Aldis M. was'nt lying. Suyapa M. confirmed that the children were indeed next door at her house. That is because according to Suyapa M. the children were always at my house on Saturday mornings, and because Aldis M. had told her Mother that at some point he [i.e Gonzales] was going to come over and pick up the children, from Suyapa M.'s house. (Vol. 4; p. 218 -19; 1. 12-2).

Regardless, according to Aldis M., she and Gonzales then "just argued a liitle bit"(Vol.4; p. 124; 1. 10)(Vol. 4; p. 130; 1.16-18), as they often did(Vol. 4; p. 124; 1.12-14). During this argument. Aldis M. was telling Gonzales that she wanted him to leave. (Vol.4; p. 124; 1. 22-24).

10.

But Gonzales didnot leave. He was still in Aldis M.'s trailer home. The two were arguing "right beside the couch" near the front door. (Vol.4; p. 130; 1. 19)(Vol. 4; p. 130; 1. 13-14). Aldis M. gave the following testimony:

Q. [D]o you recall telling - I guess its investigator Zinn that he [i.e. Gonzales] wouldn't step outside; he started insulting me. do you remember that?

A. We started arguing.

Q. what was he saying that was insultimg you?

A. I don't remember.

Q. Well, apparently that day at - 30 minutes later [i.e. after the shoting], you remember that he [i.e. Gonzales] was insulting you. What was he saying that was insulting you?

A. We were arguing.

(Vol. 4; p. 156-57; 1. 19-5)

Q. It [i.e., the argument] was loud?

A. Yes.

Q. Loud enough that Clint [Wilson] could hear it back in the bedroom if he had been listening.

A. Yes

Q. And then before Clint [Wilson] ever came out, Juvenal Gonzales said something about the little bitch boyfriend in the bedroom did'nt he?

A. No.

Q. Now that you've had a chance to refresh your recollection by reading your statement, do you recall that you said he starting insulting me and saying, what, you got your little bitch boyfriend in there - do you remember that now?

A. That part, yes, I do.

Q. And again, you told him to just leave, did'nt you.

A. Yes.

Q. Because you and he were through?

A. Yeah.

Q. Did that piss him off?

A. Yes.

Q. So he wasn't just a happy guy just coming to see his kids, was he?

11.

A. No.

Q. He was pissed off at you and Mr. Wilson, was'nt he?

A. Yeah.

(Vol. 4; pp. 157-59; 1. 18-7). During cross, Aldis M. admitted that she wrote a statement to the police about thirty minutes after the shooting saying that Gonzales had "tried to go forward to the kitchen."(Vol. 4; p. 160; 1. 17-23).

According to Aldis M., it was around this time "when Clint [ Wilson] came out of the [back] bedroom." (Vol. 4; p. 124; 1. 10-11). Gonzales presence surprised Wilson. Gonzales had never been at Aldis M.'s home while he was there. (Vol.6; p. 162; 1. 11-13).

Wilson came out of the bedroom because he had heard Aldis M. screaming in a way that he had never heard before. (Vol.6; p. 140 ; 1. 6-8). Said Wilson, "[T]here was panic in her voice, so that scared me. I thought he [ i.e., Gonzales] was hurting her." (Vol. 6; p. 140; 1. 8-10). See also(Vol 6; p. 142; 1. 7-8)(referring to Wilson hearing "panic" in Aldis M."s voice).

Wilson knew that with his frostbit hands he coild not defend himself against Gonzales. (Vol.6; p. 142; 1. 18-19). For that reason Wilson had gotten the pistol that was on the nightstand in the bedroom he and Aldis M. were sharing. (Vol.6; p. 142;1. 15-16).

Wilson observed Aldis M. struggling to get away from Gonzales, who was holding Aldis M. by Aldis M.'s right arm. (Vol. 6; p. 143 ; 1. 4-6). Wilson told Gonzales to leave, that Aldis M. had asked her to leave. (VOl. 4; p. 131; 1. 10-11). Gonzales then let Aldis m. go. (Vol.6; p. 143-44; 1. 24-2).

After that, Gonzales began "mouthing' and "cussing out" Wilson.(Vol. 4; p. 131; 1. 23), and Wilson responded in kind. (vol. 4 ; p. 132; 1. 1-4). Said Aldis M., "They were just cussing each other out." (Vol. 4; p. 132; 1. 7).Aldis M. admitted that Gonzales called Wilson " a bitch", and she testified that Wilson cussed Gonzales back. (Vol. 4; p. 162; 1. 25-3).

Wilson was only wearing boxer shorts. (Vol. 4; p. 162; 1. 20-21 ). Wilson was not wearing a shirt. (Vol.4; p. 188; 1. 5).

According to Aldis M., Wilson first stayed back near the back bedroom for a few minutes. (Vol.4; p. 130; 1. 7). Wilson " started walking [out of the bedroom] he had his hands behind his back" .(Vol. 4; p. 125; 1. 2-3). This scared Aldis M. she was afraid

12.

Wilson had a gun behind his back. (Vol. 4; p. 125; l. 6 & 10-11).

Aldis M. told Wilson to go back into the bedroom, that she would handle it. (Vool. 4; p. 125; l. 16-18). After all Wilson was not the subject of the argument. Rather, Aldis M. and Gonzales were arguing about there children. (Vol. 4; p. 125; l. 21-23).

Meanwhile, Sanchez wa still out in the truck, and she continued to be looking down at Gonzales's cell phone trying to unlock it(Vol.4; p. 92; l. 22-24), so she could call and text her bother.

Around this time Sanchez testified that she heard "a really loud noise like - you know, like a shot was - had been fired." (Vol. 4; p. 153; l. 15-17). Although it scared her, Sanchez saw Gonzales was still standing at "[t]he same spot where he had been standing at the whole time. He wa just standing there." (Vol.4; p. 54; l. 4-5)(Vol.4; p. 95; l. 5-7)(Vol.4; p. 96; l. &). According to Aldis M. Wilson had just shot into the floor.(Vol.4; p. 136;l. 7-9)(Vol.4; p. 165; l.8)(Vol.4; p. 185; l. 17-20). Wilson agreed with this testimony. (Vol.6; p. 145; l. 1-7).

GOnzales did not leave (Vol. 4; p. 138; l. 5-8). To the contrary Gonzales responded to this warning shot by telling Wilson, "You don't know who your fucking with bitch."(Vol. 6; p. 146; l. 15-17). Aldis M. later wrote on Facebook that Wilson's warning shot had nothing mor than "piss off" Gonzales. (Vol. 4; p. 152; l. 22-23)(Vol. 4; p.153; l. 6-8).

Sanchez then heard a second shot. (Vol.4; p. 55; l. 4). According to ALdis M., Wilson had just shot into the wall. (Vol.4; p. 136; l. 11)(Vol.4; p.165; l. 18)(Vol.4; p.185; l. 21-22). Also according to Aldis M., This second shot took place "a little less than" one minute fater the first shot. (Vol. 4; p. 86; l. 15). Her mother, Suyapa M. said it was "seconds."(Vol.4; p.229; l. 4-5).

Gonzales still did not leave.(Vol.4; p.138; l. 5-8). Again Aldis M. later wrote on Facebook that all Wilson's warning shot had done was "piss off" Gonzales.(Vol.4; p. 152; l. 22-23)(Vol. 4; p.153; l. 6_8). In this regard Aldis M. gave the folowing testimony:

> Q. Do you remember telling officer Zinn, your statement, Juvenal [Gonzales] didn't get scared or anything; he just started coming towards my boyfriend [i.e. Wilson]

13.

to start fighting?

A. No.

Q. After having had an opportunity to refresh your recollection by reading your staement [which she gave to police 30 minutes after the shooting], do you recall stating, but Juvenal [Gonzales] did'nt get scared or anything; he just started to come towards my boyfriend to start fighting?

A. When I talked to them [i.e., the police], that's - not the way I said it.

Q. Again, this is your handwriting?

A. Yes, but I talked to them --

Q. These are your words?

A. Yeah.

Q. You wrote it out?

A. Yes, I did.

Q. You signed it?

Q. Nobody told you what to write down?

A. No.

Q. You wrote - they said, write what happened?

A. Yeah.

(Vol. 4; pp.165-67; 1. 22-2). As for Wilson he testified that after a warning shot, **Gonzales indeed made a step towards him.** (Vol .6; p. 164; 1. 21-25).

Given the fact that it was less than four weeks aftewr the frostbite, Wilson knew he could not fight mano -a- mano with Gonzales. Once again, Aldis M. confirms this -- albeit very reluctantly:

Q. And then the next [written] statement [you make to the police] is, but my boy friend then shot straight because he fight. He had an accident and has both his hands and foot hurt. Correct? Or do you need to read it again?

A. I heard you.

Q. Do you need to read it?

A. No.

Q. Do you recall making that statement?

A. No.

Q. I'm going to let you read it [i.e., her own statement]

14.

and see if you recall making it then?

A. I already read it, you showed it to me.

Q. So you don't recall writing this out that day?

A. I wrote but like I said that's - that day, I was in shock, and just did'nt know how to put words.

(Vol. 4; p. 167; 1.3-19)

Q. Could Clint [Wilson] have defended himself that day with his hands?

A. Could he?

Q. In the condition that his hands were in?

A. Yeah.

Q. Even though you say on that day it happend, he [i.e., Wilson] can't fight; he had an accident and both of his hands nad his feet [were] hurt?

A. he couldn't move that good but he - he could.

Q. In fact, you remember that all he [i.e., Wilson] could was this gesturing?

A. Yeah.

Q. That all he could was that; he couldn't make a fist. And in fact, it hurt his hand to touch anything with them, didn'tit?

A. Yeah.

(Vol.4; p.168; 1. 2- 18). As noted previously, Suyapa M. testified that she had seen Wilson's hands without any bandages.(Vol. 4; p.225; 1. 2-4). According to her Wilson's hands were dark, and Wilson was unable to move his fingers. (Vol.4; p.225; 1. 4-9), although by January 19,2013 he was able to use his hands to drive a car.(Vol. 4; p. 194; 1. 11-13).

It was at that point - i.e., after Gonzales moved towards Wilson dispite Wilson firing a warning shot (Vol. 6; p. 164; 1, 21-25) - that Wilson fired a third shot, which, according to Aldis M., hit Gonzales, although she is not sure where. (Vol.4; p. 136; 1. 15-24).

Wilson acknowledged that he shot Gonzales. (Vol.6; pp.108-09; 1. 25-5)(Vol.6; p. 146; 1. 21). Wilson explained:

Q. At that moment[i.e., at the time of the shooting], did you have reason to believe, based on your conversations with him in the past and the way ha appeared that day, that he was going to hurt you?

15.

A. I knew he was going to hurt me.

Q. And when I say hurt you , what did you think he was going to do to you?

A. **Exactly what he told me he was going to do. Drag me out of the house, hang me from a tree, and skin me like a fish. That's what he told me.**

Q. Were you afraid he was going to - you would not be able to defend yourself to the point that you could stop him without anything other than the weapon?

A. I couldn't have stopped him at all.

Q. At that moment, were you in fear for your life?

A. I was in fear for my life, as well as their safety and their life, yes.

Q. And did you believe that you had to act right at that instant to prevent anything else from happening?

A. Yes, sir . He was coming at me.

   ...

Q. Did you feel it was necessary for you to act in some fashion at that point?

A. Yes, sir. I had no choice. I gave him [i.e., Gonzales] every opportunity to leave. He refused to leave. I did not want to hurt the man. I practically begged him to leave. He refused.

(VOl. 6; pp.147-48; 1. 8-17). Wilson then fired additional shots; they; too hit Gonzales. (Vol. 4; p.136; 1. 10-16).

Wilson also remembered a time when another individual, this one Hopkins County, had stabbed him, resulting in him being hospitalized and receiving about a dozen staples near his heart. (Vol. 6; p. 156-57; 1. 11-9). Said Wilson, "My chest was laid open." (Vol.6; p.210-; 1. 13-14).

Sanchez heard the shots. (Vol.4; p. 55; 1. 10-12). So did Suyapa M. according to her, there were no pauses; rather, the shots were fired in rapid succession. (Vol.4; p.229; 1. 11-15). Sanchez then saw Gonzales "run out the door."(Vol.4; p.55; 1. 4-8)(Vol.4; p.55; 1. 13-14).

Sanchez saw Wilson - apparently, he was now fully clothed-- leave the trailer home and drive off quickly in his car past the driver side of Gonzales's truck.(Vol. 4; p. 63; 1. 15-24)(Vol. 4;

16.

p. 214; 1. 14-15). Wilson acknowledged that he left Aldis M.'s trailer home. (Vol.6; p. 161; 1. 7-8).Wilson added that he left the pistol on the bed in the bedroom where he and Aldis M. stayed. (Vol.6; p. 161; 1. 10-11). Curiously, Aldis M. covered up the pistol with a towel.(Vol. p.145; 1. 3-8). Aldis M. testified that she does not know why she did this.(Vol. 4; p.145; 1. 17).

The first responding officer on the scene checked Gonzales for a pulse and found none.(Vol.5; p.31; 1. 21-25). Sanchez testified " I saw him [i.e., Gonzales] die, and I knew he was dead[.]"(Vol. 4; p. 73; 1. 17).

The first responding also talked to Aldis M. The officer asked Aldis M. to step out of the trailer home, if anyone else was inside, and if she would give a brief discription of what happened. (Vol.5; p.33; 1. 19-24). The officer found Aldis M. to be <u>defensive</u>. (Vol.5; pp.33-34; 1. 25-2).

Aldis M. told the first responding officer on video tape - law enforcement produced the tape minutes after the shooting, and the State offered it at trial -- that Gonzales had been <u>hitting</u> her. (Vol.7; pp.30-31; 1. 25-1). Aldis M. also told the first responding officer that Gonzales had threatened her multiple times. (Vol 5; pp. 40-41; 1. 24-6). Finally, Aldis M. told the first responding officer that Gonzales was "not even allowed" to be there. (Vol. 5; p.42; 1. 7-12).

The Justice of the Peace went to the Hospital and pronounced Gonzales "deceased" from "multiple gun shot wounds." (Vol.5; pp. 213-14; 1. 23-4).

Sanchez testified that during the entire morning - i.e., from the time that Gonzales picked her up to the time of the shooting-Gonzales had drunk <u>less than five beers</u>.(Vol.4; p.43; 1.24). However, Sanchez also acknowledged that Gonzales had been drinking the night before. (Vol.4; p.44; 1. 2).In any event, the State advised that at the time of his death, Gonzales's blood alcohol concentration was about 0.27 - actually, according to the medical examiners report it was 0.296 (Vol. 5; pp. 176-77; 1. 24-1) -- which the State observed, correctly, is " over three times the legal limit of .08 if your going to drive a car."(Vol.4; p .19; 1. 10-12).

17.

Wilson was arrested later that same day, i.e, January 19, 20-13. According to the arresting officer, Wilson offered no resistance whatsoever. (Vol. 5; p.24; 1. 16-17).

P.O. Box 918
Sulphur Springs, TX 75483-0918
903.689.4144 East Texas
972.499.4004 Dallas/Fort Worth
903.689.7001 Facsimile
**wade@forsmanlaw.com**

Attorney for Appellant
Clint Weldon Wilson

## Certificate of Word Count

Pursuant to Tex.R.App.P. 9.4 (i)(3), This document contains 10,-808 words.

/s/ Wade A. Forsman

**Wade A. Forsman**

## Certificate of Service

This is to certify that on **May 7, 2014,** I served a true and correct copy of the above and foregoing Appellant's Brief by hand on Will Ramsay, District Attorney, and Peter Morgan, Assistant District Attorney, at 114 Main Street, Sulphur Springs Texas 754-82.

/s/ Wade A. Forsman

**Wade a. Forsman**

## Preview of Argument

**Ground One:**

The court of Appeals erred in it's disposition; that the evidence was sufficient to Justify the trial court's charge to the Jury on the issue of Applicant having Proviked the difficulty.

## Argument

**Ground One:**

The Court of Appeals erred in it's disposition of Applicants Fourth Ground of error, thta the evidence was sufficient to justify the trial court's charge to the Jury on the issue of Applicant having Provked the difficulty.

The Court of Appeals, in it's Memorandum Opinion of page 7, sec, exhibit A., claimed there is ample evidence to support instucting the JUry on the Provocation from the Relevant testimony, the Court claimed that " Applicant purposefully inserted himself into a Domestic Dispute and threatened Gonzales with a firearm and the words he used were calculated to Provoke the attack on Gonzales." Id.

## Jury Instruction on Provoking The Difficulty

The governing law on instructing a Jury on Provoking the difficulty is properly given when: (1) Self defense is an issue; (2) there are facts in evidence which show that the deceased made the first attack on the defendant; and (3) the defendant did some act or used some words intended to and calculated to bring on the difficulty in order to have Pretext for inflicting injury on the deceased. see Williamson Vs. State, 672 Sw. 2nd 484-485-86 (Tex. Crim.App. 1984); Smith Vs. State, 965 Sw. 2nd 509-513 (TexCrim.App. 1998).

All elements are qouestions of fact. Id. at 513. An instruction on Provocation should only be given where there is evidence from which a Rational Jury could find every element of Provocation beyond a Reasonable Doubt. see Id. at 513; also Matthews Vs. State, 708 Sw. 2nd 835,838 (Tex.Crim.App. 1986). Under such an analyses the Appellate ask if there was sufficient from which a Rational Jury could have found Provocation beyond a Reasonable Doubt, viewing the evidence in light most favorable to the given instruction. Smith,at 513.

20.

In the case at hand, viewing the evidence in the light most favorable to the given instruction, there were sufficient evidence from which a Rational Jury could have found Provocation beyond a Reasonable Doubt in the first two elements in this Jury instruction. (1) Self-defense was the issue inthis instant case; and (2) there are facts that deceased Gonzales made the first attack on the Applicant.

The facts that a Rational Jury could have found beyond a Reasonable Doubt, that the deceased made the first attack on Applicant was that; the deceased Gonzales threatend Applicant to drag him out of the house, hang him in a tree and skin him like a fish.

Here, to the question of the fact upon thr third element, to charge the Jury on Provoking the difficulty, that applicant did some act or used some words intended to or calculated to being on the difficulty in order to have a Pretext of inflicting injury upon the deceased; the evidence is insufficient from which a Rational Jury could have found Provcation beyond a Reasonable Doubt.

The facts of this case clearly shows beyond a Resonable Doubt, that on the morning of the killing of Gonzales, Gonzales: (1) was known to be a mean drunk; (2) was verey drunk, (0.296); (3) came to the residence (Habitation) of Aldis M.; (4) knew applicant was living with Aldis M. in a full relationship for over _6_months; (5) was told not to come over to the Residence; (6) entered the_____ habitation of Aldis M.'s and applicant without permission (unlawfully); and (7) was asked by Aldis M. to leave, and refusing to leave Gonzalews reacted violently by grabbing Aldis M. by the arm with force making Aldis M. scream.

Applicant, being concerend for Aldis M., which a reasonable person would have, came out of the bedroom with a firearm, because he could not have defended himself or Aldis M. with his bare hands being seriously frostbitten. He then asked Gonzales to leave, and Gonzales began to argue. Applicant and Gonzales began to exchange heated words between the two. In doing so , when Gonza;es still refused to leave, Applicant pulled out the firearm from behind his back and pointed it at Gonzales. Gonzales had already made the first attack on applicant when he told applicant that he

wil drag him out of the house, hang him in a tree, and skin him like a fish. Applicant demended Gonzales to leave. Refusing to leave and ignoring all Respected Pleas by Applicant and Aldis M., Gonzales reacted more violently. Applicant then fired two warning shots, one in the wall and one in the floor. Ignoring all these Pleas . Gonzales lunged toward applicant and applicant fired several shots ended in killing Gonzales.

From this evidence that clearly shows in the Record, a Reasonable Jury would have seen that Gonzales provoked the difficulty unto applicant. Applicant gave Gonzales every opportunity to leave even though Gonzales was acting violently.

In Williamson Vs. State, 672 Sw. 2nd 484, 486 (tex.Crim.App. 1984), the same situation as it is here in applicants case, Williamson asked the deceased Jamison to leave his house and Jamison began to argue with Wiliiamson. Jamison reacted violently by lunging toward Williamson's <u>Machete</u> to assault him and Williamson killed Jamison by shooting him in the head with his Rifle. This Court made a Judicial determination on the fcats that the evidence did not raise the issue that it was Williamson's purpose to provoke an attack from the deceased Jamison, in order that he might have a Pretext for killing Jamison. This Court Reversed and Remanded this cause back to trial Court. Id. at 486.

Therefore, here in this instant case, viewing the evidence in light most favorable to the given instruction, the evidence is insufficient to conclude that applicant provoked difficulty in order to have a Pretext for inflicting deadly force upon the deceased. Thses fcats clearly prove beyond a Reasonable Doubt that this evidence does not Raise the issue, that it was applicant's purpose to provoke an attack from Gonzales in order that he have a Pretext for killing Gonzales.

The Court of Appeals did erred in it's disposition, for these facts and the evidence, a Rational Jury could not have found every element of Provocation beyon a Reasonable Doubt.

## Conclusion

Through this evidence and the facts at hand, this Court can conclude that the Court of Appeals did erred in it's disposition in Ground One of their Memorandum Opinion. This case mirrors this courts decision made in <u>Williamson Vs. State</u>. The Court of Appea-

22.

ls did not address the issue of a duty to Retreat; for not doing so, Applicant does not.

In The Court of Appeals Memorandum Opinion on Grounds 2-6, the issues were determined in accordance with the law of this State.

## Prayer

Wherefore, Premises Considered, Applicant prays that this Honorable Court of Criminal Appeals determined these facts to be true and address it in accordance with the Judicial determinations made by this Honorable Court.

So prayed on this __30th__ day of January, 2015.

Respectfully Submitted,

Clint Weldon Wilson
#1891353
Clements Unit
9601 Spur 591
Amarillo, Texas 79107

## Certificate of Service

I, <u>Clint Weldon Wilson</u>, state under the Penalty of Perjury that these facts are true and correct. Also a true and correct copy has been forwarded to the opposing party at the address below.

Excuted on this __30th__ day of January, 2015.

Clint Weldon Wilson

Will Ramsay
Hopkins County District
Attorney
114 Main Street
Sulphur Springs, Texas 75482
903.885.0641



# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00021-CR

_____

CLINT WELDON WILSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 8th District Court
Franklin County, Texas
Trial Court No. F8775

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

In January 2013, Aldis Mendez[1] stood between two men, her then boyfriend, Clint Weldon Wilson, and her ex-boyfriend and father to her three children, Juvenal Gonzales, just before Wilson shot and killed Gonzales. Except for the central fact that Wilson shot Gonzales, Aldis' version of the events that ensued had little in common with Wilson's version. The jury believed Aldis and delivered a verdict that Wilson was guilty of murdering Gonzales.[2] On appeal, Wilson complains about the jury charge, the lack of a mistrial, and the amendment of the indictment after trial began. We affirm the judgment of the trial court, because (1) the jury instruction on provocation was warranted by the evidence, (2) a jury instruction on threats by the victim was properly refused, (3) a jury instruction on necessity was properly refused, (4) mistrial was not mandated, (5) Wilson's complaint regarding the lack of a jury instruction on justifiable force is inadequately briefed on appeal, and (6) we have no jurisdiction over the amendment of the indictment in a companion case not on appeal.

We set out the basics of the two different versions of the facts surrounding the shooting.

Wilson's version of the facts portrayed him as a disabled man seeking only to protect his girlfriend and himself from a drunken, violent ex-boyfriend. Wilson testified that he met Aldis in late August 2012 and had lived with her and her three children in her mobile home until late November of that year. He left her for another woman, but began seeing her again in December

---

[1]Because we also refer herein to Aldis Mendez' mother, Supaya Mendez, we will refer to both women by their first names.

[2]On the murder charge, appealed here, Wilson was sentenced to life in prison and assessed a $10,000.00 fine. Wilson was also found guilty of unlawful possession of a firearm by a felon and sentenced to ten years' confinement, to run concurrently, and assessed another $10,000.00 fine. He does not appeal the firearm conviction.

when the other relationship faltered. Around Christmas, his hands and a foot were frostbitten from exposure.[3] Aldis picked him up from the hospital and took him to her home where he stayed until the shooting. Several times during the period he lived with Aldis, she would receive telephone calls late at night from Gonzalez. Aldis would give Wilson the telephone. He would tell Gonzalez that she did not want to talk to him or get back together with him and to stop calling. Gonzalez would call two or three nights in a row, then stop and begin again two or three weeks later. During these conversations, Gonzalez would reportedly curse Wilson, threaten to "f*** [Wilson] up," and threaten his life. About seven to ten days before the shooting, Gonzalez told Wilson he was "going to come out there, drag [him] from the house, hang [him] on a tree, and skin [him] like a fish."

Wilson also testified that, on the morning of January 19, 2013, he and Aldis were sleeping in bed when they were awakened by yelling in the living room. Aldis looked at him with panic in her eyes and said, "It's [Gonzales]," and ran into the living room. Wilson did not follow her because he thought she could handle the situation. But Aldis and Gonzales kept arguing, and it was getting louder and louder. Wilson heard her scream, grabbed a pistol, and proceeded to the kitchen. Wilson claimed he grabbed the pistol because he could not defend himself against Gonzalez. When Wilson got to the kitchen, Aldis was struggling to get away from Gonzalez. Wilson told him, "[L]et her go, motherf*****," then pointed the pistol at Gonzalez. Gonzalez let Aldis go, and she ran behind Wilson. Wilson kept telling Gonzalez to leave, but Gonzalez just said, "[Y]ou ain't going [to] do nothing, you little bitch." Wilson then

---

[3]Wilson had been hanging out with his cousin, took methamphetamine, got lost, and passed out in a field in the snow for several hours.

3

fired a warning shot through the floor. He did not want to hurt Gonzalez, but he was afraid of him and wanted him to leave. Instead, Gonzalez got more aggressive, and Wilson fired a second warning shot through the wall. Gonzalez bowed up, cursed him, and lunged at him. Wilson then shot him four or five times "for [himself] and for -- Aldis and Lexi (Aldis' daughter)." Wilson said he was afraid for his life, as well as the lives of Aldis and Lexi, and claimed he had no choice. Wilson then told the jury of a similar incident that occurred a year earlier in which he had to defend himself from the ex-boyfriend of his then girlfriend. Wilson ended up killing him, also. Although denying he posted it, Wilson admitted opening a Facebook page in which he bragged about having studied at the Harvard Law School of Self-Defense Class of 2011. He claimed self-defense in that case, also, and charges were dismissed in August 2012. On August 8, 2012, a post appeared on his Facebook in which he apparently bragged about it.

Aldis' version was considerably different, and she was the only other surviving witness to the events inside the mobile home. She testified that Gonzalez was the father of her three children and that they had broken up in March 2012. She said that she met and began dating Wilson in September and that he would stay every other day or so. She confirmed that Gonzalez came over unannounced that morning and that she went out to talk with him. They began arguing "a little bit" and she told him to leave, then Wilson came out of the bedroom. Wilson was walking with his hand behind his back and she got scared because she thought he had a gun. Aldis told Wilson to go back to the bedroom and that she would handle it, not to worry about it. Wilson told Gonzalez to leave, and the two men began mouthing back and forth, cussing at each other. She kept telling Wilson that she would handle it and that she would make Gonzalez leave.

4

She was not afraid Gonzalez would hurt her. Then Wilson took a step forward and pulled out the gun. She told him not to do anything. She picked up her daughter, Lexi, and lifted her out through the back door because she did not want her to see whatever was going to happen. Then, Wilson fired a shot through the floor. Next, Wilson shot through the wall. Right after that, he shot Gonzalez the first time, then a second time. Gonzalez had only taken one step forward and then he was shot. She closed her eyes and kept telling Wilson to stop. The shots came back to back, and she opened her eyes after the third or fourth shot, when Gonzalez was going out the door. She was in shock.

She also testified that she did not feel threatened by Gonzalez that day and did not think he made any threat that deserved being shot. He never displayed a weapon and never threatened to kill anyone that day. Aldis acknowledged that Gonzalez and Wilson had argued over the telephone, but denied that Gonzalez ever threatened to come over and kill him. On cross-examination, she admitted that Gonzalez was "pissed off" at both she and Wilson that day. She also admitted that Wilson could not make a fist that day because of his frostbite.

Supaya Mendez, Aldis' mother, testified that Gonzalez was a fighter but never used weapons. Supaya was never afraid of him killing anyone. She said that Aldis and Gonzalez would argue a lot because he drank a lot. He would get violent when he drank, but not toward her, just toward the walls.

The medical examiner who performed the autopsy on Gonzalez testified that, based on her examination, one shot entered the front of his body, one entered his left side, and two entered at his lower back/buttocks. One or two other bullets grazed his back.

5

*(1)    The Jury Instruction on Provocation Was Warranted by the Evidence*

Wilson complains of the trial court's inclusion of a charge on provocation, asserting there was no evidence that would support its inclusion.[4] We find there was sufficient evidence to include the instruction and overrule this point of error.

Our review of an alleged error in a jury charge involves a two-step inquiry. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). First, we determine whether an error occurred, and, if it did, then we "determine whether sufficient harm resulted from the error to require reversal." *Id.* at 731–32; *Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1984) (op. on reh'g), *reaff'd by Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

The level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. When a proper objection is made at trial, reversal is required if the error is "calculated to injure the rights of defendant"—the appellant need only demonstrate "some harm" on appeal. *Id.*; *see also Almanza*, 686 S.W.2d at 171. In the case of unpreserved error, reversal is required only when "the error is so egregious and created such harm that [the defendant] 'has not had a fair and impartial trial' -- in short 'egregious harm.'" *Almanza*, 686 S.W.2d at 171; *see Rudd v. State*, 921 S.W.2d 370, 373 (Tex. App.—Texarkana 1996, pet. ref'd). "Egregious harm" results from errors affecting the very basis of the case or that deprive the defendant of a valuable

---

[4]The Jury Instructions included a definition of "Provoking the Use or Attempted Use of Force," an instruction on "Failure to Retreat," and an instruction on "Presumption," all of which are substantially the same as those set forth in Sections B14.8 and B15.3 of the State Bar of Texas' TEXAS CRIMINAL PATTERN JURY CHARGES—DEFENSES §§ (2013). The "Failure to Retreat" and "Presumption" instructions are based on Sections 9.32(b) and (c), respectively, of the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 9.32(b), (c) (West 2011). It is unclear from the record and Wilson's brief whether he is complaining of the definition only or also the mentioning of provocation in these other instructions.

6

right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive. *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991); *Smith v. State*, 424 S.W.3d 588, 597 (Tex. App.—Texarkana 2013, no pet.).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). A trial court must submit a charge setting forth the "law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007); *Reeves v. State*, 420 S.W.3d 812 (Tex. Crim. App. 2013). "It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Reeves*, 420 S.W.3d at 818 (quoting *Williams v. State*, 547 S.W.2d 18, 20 (Tex. Crim. App. 1977)).

> The trial court must give a charge on provocation
>
> when there is sufficient evidence (1) that the defendant did some act or used some words which provoked the attack on him, (2) that such act or words were reasonably calculated to provoke the attack, and (3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm on the other.

*Smith v. State*, 965 S.W.2d 509, 513 (Tex. 1998).

Each of the three elements may be proved circumstantially. *Id.* at 515, 517–18. A provocation instruction should be submitted to the jury only "when there is evidence from which a rational jury could find every element of provocation beyond a reasonable doubt." *Id.* at 514. Our inquiry is whether "a rational jury could have found provocation beyond a reasonable doubt, viewing the evidence in the light most favorable to giving the instruction." *Id.*

7

There is ample evidence to support instructing the jury on provocation. From the above relevant testimony, it could be reasonably inferred that Wilson purposefully inserted himself into a domestic dispute and that threatening Gonzalez with a firearm and the words he used were calculated to provoke the attack by Gonzalez. In his brief, Wilson focuses on the lack of direct evidence of "words or acts" that prove the third element, i.e., that Wilson intended to provoke the difficulty as pretext for inflicting injury on the deceased. However, a jury does "not need to be able to put its hands on the particular act or words[;]" rather, "this finding can be made through inference relying on circumstantial evidence." *Id.* at 515. From the medical examiner's testimony, a jury could reasonably infer that Gonzalez stopped his advance after being shot once and began turning to retreat. Wilson, however, kept shooting and shot Gonzales in the side, then at least three times in the back. In addition, Wilson testified that he had had several run-ins with Gonzalez over the telephone and that a few days before this incident Gonzalez threatened to kill him. A rational jury could have inferred his intent from this evidence, coupled with Wilson's recent prior homicide in which he successfully claimed self-defense. Thus, there is evidence of each element that supports the court's decision to include the instruction.

Accordingly, we conclude that the trial court did not err in instructing the jury on provocation.

8

*(2)    A Jury Instruction on Threats by the Victim Was Properly Refused*

Wilson also complains of the lack of an instruction on the prior threats made by Gonzalez.[5] Because the proposed instruction would have been an impermissible comment on the weight of the evidence, we overrule this point of error.

In asserting entitlement to an instruction on threats by Gonzalez, Wilson relies on *Fielder v. State*, 756 S.W.2d 309 (Tex Crim. App. 1988). However, the complaint in *Fielder* was the exclusion of *evidence* related to the defendant's past relationship with the deceased and the reasonableness of her fear of him. *Id.* at 318. Wilson makes no such complaint on appeal.[6] Rather, this case is controlled by *Walters v. State*, 247 S.W.3d 204 (Tex. Crim. App. 2007).

In *Walters*, the Texas Court of Criminal Appeals considered whether, in a murder case where the jury is charged on self-defense, the defendant is entitled to an instruction on prior oral threats by the deceased.[7] The court held that,

> generally speaking, neither the defendant nor the State is entitled to a special jury instruction relating to a statutory offense or defense if that instruction (1) is not grounded in the Penal Code, (2) is covered by the general charge to the jury, and (3) focuses the jury's attention on a specific type of evidence that may support an element of an offense or a defense. In such a case, the non-statutory instruction would constitute a prohibited comment on the weight of the evidence.

---

[5]Wilson requested the following instruction:

> Where a defendant accused of murder seeks to justify himself on the ground of threats against his own life, he is permitted to introduce evidence of the threats made, but the same shall not be regarded as affording justification for the offense unless it be shown, at the time of the killing, the person killed by some acts then done, manifested in an intention to execute the threats so made, and provided that a reasonable person in the defendant's situation would not have retreated.

[6]Wilson testified at trial about the threats to his life made by Gonzalez, and his trial counsel emphasized these threats and Gonzalez' violent nature in his final argument.

[7]The proffered instruction was identical to the one in this case.

9

*Id.* at 212. As in *Walters*, the proffered instruction meets all three criteria. First, the Texas Penal Code does not recognize prior oral threats as a defense or justification. Second, the trial court included the statutory definition of "reasonable belief," which would necessarily include threats made before the incident. *Id.* at 213. Third, giving the instruction would unduly focus attention on evidence in support of a finding of self-defense by "improperly tell[ing] the jury how to consider certain evidence before it." *Id.* at 214.

Accordingly, we conclude that the trial court did not err in denying Wilson's request for an instruction on prior oral threats.

*(3)   A Jury Instruction on Necessity Was Properly Refused*

Wilson complains that he was entitled to a jury instruction on the defense of necessity.[8] Since the trial court charged the jury on self-defense using deadly force, we find that the trial court did not err in refusing to include an instruction on necessity.

Under Section 9.22 of the Texas Penal Code, conduct is justified under necessity, if

> (1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;
> (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and
> (3) a legislative purpose to exclude the justification claimed for the conduct does not · otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22 (West 2011).

---

[8]In his brief on this point of error, Wilson merely quotes verbatim his trial counsel's argument made to the trial court. Since the argument below included appropriate legal authority and argument based on that authority, we will address the point of error. Our addressing this point of error should not be taken as approval of this very questionable practice.

Thus, if there is a plain legislative purpose to exclude the defense of necessity, then subsection (3) precludes its application. This Court has previously held that a defendant is not entitled to an instruction on necessity when self-defense using deadly force is an issue since including an instruction on necessity "would undermine the Legislature's purpose in imposing the duty to retreat" in Section 9.32 of the Texas Penal Code. *Searcy v. State*, 231 S.W.3d 539, 544 (Tex. App.—Texarkana 2007, pet. ref'd); *see Butler v. State*, 663 S.W.2d 492, 496 (Tex. App.—Dallas 1983), *aff'd on other grounds*, 736 S.W.2d 668 (Tex. Crim. App. 1987).

However, these cases were decided under the former version of Section 9.32 that contained a "legislative purpose" to require retreat, if a reasonable person would, before using deadly force.[9] *See Butler*, 663 S.W.2d at 496. In 2007, the Legislature amended Section 9.32, removing the retreat provisions and adding "provisions specifying when a person does *not* have a duty to retreat." *Morales v. State*, 357 S.W.3d 1, 5 (Tex. Crim. App. 2011). Thus, a legislative purpose to require retreat before using deadly force no longer "plainly appear(s)" in Section 9.32, as required to preclude an instruction under Section 9.22. Nevertheless, we find that

---

[9]The former version of Section 9.32 of the Texas Penal Code provided,

> A person is justified in using deadly force against another:
>
> (1)     if he would be justified in using force against the other under Section 9.31 of this code;
> (2)     if a reasonable person in the actor's situation would not have retreated; and
> (3)     when and to the degree he reasonably believes the deadly force is immediately necessary:
>     (A)     to protect himself against the other's use or attempted use of unlawful deadly force; or
>     (B)     to prevent the other's imminent commission of aggravated kidnapping, murder, rape, aggravated rape, robbery, or aggravated robbery.

Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.32 (a) (West 2011)).

11

Section 9.32 still contains a plain legislative purpose that precludes the inclusion of an instruction on necessity when a Section 9.32 defense is implicated.

Section 9.32 provides, in pertinent part, as follows:

(a) A person is justified in using deadly force against another:

    (1) if the actor would be justified in using force against the other under Section 9.31; and
    (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
        (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
        (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

TEX. PENAL CODE ANN. § 9.32(a) (West 2011).

From a plain reading of the statute, it is clear that the Legislature intended to justify the use of deadly force only when one's life is immediately threatened by another's use of unlawful deadly force or to prevent the commission of specific violent crimes. By contrast, the defense of necessity has a much lower threshold before it can be asserted. Necessity requires only that the conduct be necessary to "avoid imminent harm." TEX. PENAL CODE ANN. § 9.22(1). "Harm" is defined as "anything reasonably regarded as loss, disadvantage, or injury, including harm to another person in whose welfare the person affected is interested." TEX. PENAL CODE ANN. § 1.07(a)(25) (West Supp. 2014). Allowing an instruction on necessity when, as here, the evidence requires an instruction on self-defense using deadly force would undermine the

legislative purpose of only allowing deadly force to be used to prevent the immediate threat to one's life or to prevent the commission of specific violent crimes.[10]

Accordingly, we conclude that the trial court did not err in denying Wilson's request for an instruction on necessity.

*(4)    Mistrial Was Not Mandated*

Wilson also complains about not being granted a mistrial after the State put on evidence of items used for "distributing narcotics." We find that the trial court properly instructed the jury and overrule this point of error.

During the State's direct examination of Robert Zinn, an inspector for the Franklin County Sheriff's Department, the following exchange took place:

> Q.    Besides the items directly related to the shooting, were there other things found in the house that were of interest?
> A.    Yes, sir.
> Q.    And what was that?
> A.    There was, I believe, some digital scales found, some methamphetamines found, and I believe that there was a price list of how much -- for someone that was distributing narcotics, it broke down the price of how much each of those --
>
> MR. LONG: May we approach the bench?
> THE COURT: You may.

Outside the presence of the jury, Wilson objected to any testimony regarding distributing narcotics, and the court sustained the objection. When the jury returned, the court gave the following instructions:

> THE COURT:    Please be seated. Thank you.

---

[10]Since we have found that Wilson was not entitled to an instruction on necessity when self-defense using a deadly weapon is implicated, we do not reach the State's contention that the necessity defense was not available to Wilson since he did not admit to the conduct. *See Juarez v. State*, 308 S.W.3d 398 (Tex. Crim. App. 2010).

13

Ladies and gentlemen, I have an instruction for you. It's one of those instructions that I told you you may very well be given. And what I'm going to tell you is that just before your break, you heard some testimony regarding digital scales, price lists, and some suggestion of distribution of narcotics. You are to disregard that testimony and consider it for no purpose whatsoever. All right?

Wilson then moved for a mistrial, which was denied. Thus, Wilson has properly preserved the point for appeal. *Hines v. State*, 269 S.W.3d 209, 214 (Tex. App.—Texarkana 2008, pet. ref'd).[11]

Granting a mistrial is appropriate in "those cases in which an objection could not have prevented, and an instruction to disregard could not cure, the prejudice stemming from an event at trial—i.e., where an instruction would not leave the jury in an acceptable state to continue the trial." *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). However, a mistrial is not required where prejudice is curable by an instruction to the jury to disregard. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). "A trial court's denial of a mistrial is reviewed under an abuse of discretion standard and must be upheld if within the zone of reasonable disagreement." *Brooks v. State*, 420 S.W.3d 337, 340 (Tex. App.—Texarkana 2014, no pet.) (citing *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010)).

At the time this exchange occurred, there had already been unopposed testimony regarding the presence of marihuana and methamphetamine in the mobile home and Wilson's own drug use. Later, Wilson testified of his prior convictions for aggravated assault and felony

---

[11]"The proper method of preserving error in the admission of improperly offered evidence is for appellant's counsel to: (1) state a timely specific objection, (2) obtain a ruling on the objection from the trial court, (3) move for an instruction for the jury to disregard, (4) obtain a ruling on the instruction and if sustained, have the jury instructed, (5) move for a mistrial, and (6) obtain a ruling on the motion for mistrial. These steps must be taken in sequence, and counsel cannot object and move for an instruction and mistrial without obtaining a ruling on the objection." *Hines*, 269 S.W.3d at 214 (quoting *Hadden v. State*, 829 S.W.2d 838, 841 (Tex. App.—Corpus Christi 1992, pet. ref'd)).

possession of marihuana. In addition, the testimony and items mentioned were never mentioned again. In a case such as this, in which the bulk of testimony centered around the violent behavior and the abuse of drugs and alcohol by both Wilson and Gonzalez, it is unlikely that any prejudice caused by this one isolated comment could not be cured by the trial court's instruction to disregard it.

The trial court did not abuse its discretion in overruling Wilson's motion for mistrial.

*(5) Wilson's Complaint Regarding the Lack of a Jury Instruction on Justifiable Force Is Inadequately Briefed on Appeal*

Wilson also complains that the trial court erred by denying his request to include an instruction on justifiable force. In his brief, Wilson merely sets forth verbatim the argument made by his trial counsel to the trial court. The argument does not contain any citations to statutory or caselaw, other than one general reference to the "Penal Code."

It is the duty of an appellant to cite specific legal authority and provide legal arguments based on that authority. *Bell v. State*, 90 S.W.3d 301, 305 (Tex. Crim. App. 2002). Appellate counsel is required to "cite specific legal authority and to provide legal argument based on that authority." *Rhoades v. State* 934 S.W.2d 113, 119 (Tex. Crim. App. 1996) (citing *Vuong v. State*, 830 S.W.2d 929, 940 (Tex. Crim. App. 1992)); *see* TEX. R. APP. P. 38.1(i); *Ex parte Granger*, 850 S.W.2d 513, 515 n.6 (Tex. Crim. App. 1993). Where adequate briefing is not provided, the contention can be overruled. *Rhoades*, 934 S.W.2d at 119. We overrule this contention of error.

15

*(6)*    *We Have No Jurisdiction Over the Amendment of the Indictment in a Companion Case Not on Appeal*

In his final point of error, Wilson asserts that the trial court erred when it allowed the State to amend the indictment on a related charge after trial began and over his objection. We overrule this contention.

Wilson was charged with two separate offenses that were tried together. The first, which is the subject of this appeal and over which we have jurisdiction, was for murder (trial court cause number F-8775). While the murder indictment was amended, that was done seventeen days before trial and is not part of Wilson's complaint.

The second charge was for the offense of unlawful possession of a firearm by a felon (trial court cause number F-8776). On the third day of trial, before introducing evidence of the prior offense, the State moved to amend the firearm indictment. Wilson timely objected to the amendment.

Although these charges were tried together, Wilson has not appealed from his conviction for unlawful possession of a firearm by a felon. Because no timely notice of appeal regarding that conviction was filed, we have no jurisdiction over the firearm possession case. *See Olivo v. State*, 918 S.W.2d 519, 522 (Tex. Crim. App. 1996). Accordingly, we overrule this point of error.

16

We affirm the judgment of the trial court.

Josh R. Morriss III
Chief Justice

Date Submitted:     August 28, 2014
Date Decided:      November 7, 2014

Do Not Publish